# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| KENNETH A. KELTNER, | ) |
| Plaintiff, | ) |
| v. | ) No. 2:13-cv-2840-STA-dkv |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is a personal-injury action involving claims arising from an automobile accident that occurred in Memphis, Tennessee, on June 7, 2011. Plaintiff Kenneth Keltner filed suit against Defendant United States under the Federal Tort Claims Act for injuries allegedly caused by the negligence of the United States Postal Service through its employee Leandrew Presley. The Plaintiff submitted a timely FTCA Administrative Claim with the Postal Service, in which he sought $300,000 in damages for his injuries. Exercising jurisdiction under 28 U.S.C. § 1346(b), the Court tried the case on March 16, 2013. Federal Rule of Civil Procedure 52 requires that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately."[1]

## FINDINGS OF FACT

The parties stipulated to all relevant facts establishing liability. (*See* Pretrial Order 3–4, ECF No. 18). On June 7, 2011, Keltner was driving his 2010 pickup truck eastbound on Mt. Moriah Road in Memphis, Tennessee. After waiting at the signal controlling his eastbound

---

[1] Fed. R. Civ. P. 52(a)(1).

traffic lane at an intersection, Keltner received the green light. He drove his vehicle into the intersection preparing to turn north on his way home. As Keltner entered the intersection, a 2007 Mack CXN 613 tractor-trailer owned by USPS and operated by USPS employee Leandrew Presley drove southbound into the intersection and struck the driver's side of Keltner's vehicle. The Memphis Police Department issued Presley a citation for disregarding a red light. An ambulance took Keltner from the scene of the collision to Methodist Hospital's emergency room, where he received treatment. Keltner was released from the hospital the same day. The United States concedes that "the actions of the postal driver resulted in the collision with the Plaintiff" and that "[t]he postal driver was negligent in disregarding the red light at the intersection." (Def.'s Prop. Findings of Fact and Concl. of Law 3, ECF No. 23). The only issue before the Court is the amount of damages.

Keltner claims that as a result of the United States' negligence, he suffered damages including medical expenses, pain and suffering, and loss of capacity for the enjoyment of life. Keltner testified at trial that he was "knocked out, dazed or whatever" as a result of the collision, but Methodist's records indicate that he did not report a loss of consciousness upon admission to the hospital. (Trial Tr. 16:23–25; Trial Ex. 6). He was released the same day. Keltner testified that upon release, "my left knee was all black and blue, scratched up. My neck, I was very limited on how I could move my neck without severe pain. And lower back, you know, it wasn't real bad, but it still wasn't normal. I was still experiencing pain." (Trial Tr. 23:4–5). According to Methodist, Keltner had no fractures or traumatic injuries, but an x-ray of his cervical spine revealed a congenital fusion of the C4 and C5 vertebrae and mild arthritic changes through the C6 and C7 levels. (*Id.* 47:10–15; Trial Ex. 6). He was not aware of the congenital fusion until that day and testified that he had never had any complications or pain from it. Dr. Samuel

Schroerlucke opined at his deposition, to a reasonable degree of medical certainty, that "the wreck aggravated his previously-asymptomatic degenerative condition."[2] (Dep. of Dr. Samuel Schroerlucke 20:6–17; Trial Ex. 18).

The week of the collision, Keltner traveled to Gulf Shores, Alabama, for a previously scheduled family vacation. (Trial Tr. 24–25). He testified that he was severely limited on the vacation, and he saw Dr. Lyle Cooper, a chiropractor, three times while in Gulf Shores. From June 27, 2011, through February 27, 2014, Keltner received occasional physical therapy and treatment from Tabor Orthopedics and its back and neck specialist, Dr. Samuel Schroerlucke. Dr. Schroerlucke testified that this treatment was largely unsuccessful in remedying Keltner's pain. Keltner then received a nerve block from Dr. David Dowling in May 2012, which Keltner described as providing some short-term relief. (*Id.* 28:25–29:9). Finally, between July 30, 2012, and April 21, 2014, Keltner underwent approximately six more epidural nerve blocks in an attempt to provide relief for his recurring pain. Nevertheless, from November 2012 to February 2014, Keltner sought no treatment because his nerve block was in place and apparently relieving his pain. (*Id.* 57:19–58:12). In February 2014, he reported to his doctor that he continued suffer from lower-back and left-lower-extremity pain. (*Id.* 58:16–59:4). He received his last nerve block in April 2014, and the block has given him substantial relief such that he does not intend to seek additional treatment. (*Id.* 59:25–60:7)

Keltner testified that during the year after the collision, he could not turn his neck without turning his shoulders. He experienced recurring pain. (*Id.* 29:19–25). He also reports that the collision affected his sleep pattern and forced him to sleep on the couch away from his wife. (*Id.*

---

[2] Although it is unclear whether the Defendant makes a proximate-cause challenge, the testimony at trial established that the Defendant's negligence was the legal cause of each of Keltner's injuries.

30:1–5). The testimony at trial showed that even after the accident, Keltner never lost the ability to perform activities of daily living. Today, his pain is controlled because the nerve blocks, which "last about a year," have been effective. (*Id.* 41:22–25).

Keltner testified at length about two hobbies impacted by the collision. Once an avid golfer, Keltner testified that he cannot "play golf as much as [he] would like to." (*Id.* 35:8–9). He has not lost the ability altogether, and the United States pointed out that he even asked his doctor at Tabor Orthopedics if he could resume playing golf just two months after the collision and actually began playing just three months after the collision. (*Id.* 52:15–53:25). He also testified that he still plays "once or twice a week at the most" but "cannot play in tournaments." (*Id.* 61:4–8). Moreover, Keltner's testimony that "20 years ago" he "might have played seven days a week" is not persuasive to infer that before the collision he was playing so often. (*Id.* 61:4–11). Keltner also mentioned a potential job—cleaning carts at a local golf course one day per week—that he was allegedly forced to turn down as a result of his neck pain. (*Id.* 62:22–64:11). Furthermore, he had to relinquish his 10-gague shotgun and deer rifle because of their substantial kicks. Thus, he can no longer hunt turkey or deer. While he still hunts ducks because he does not experience pain shooting a 12-gague shotgun, he did lose some ability to perform maintenance and upkeep at his duck club. (*Id.* 60:16–24).

He does not take any pain medication other than over-the-counter ibuprofen. (*Id.* 61:12–15). When asked if he has plans to go back to physical therapy, Keltner responded: "Hey, as long as I can get around like I'm doing right now without really extreme pain, you know, I don't have any plans to do anything as long as I'm in good health." (*Id.* 62:3–8). Dr. Schroerlucke testified that based on Keltner's treatment history, continued pain was probable, but periodic

4

epidural injections and a home-exercise program would be sufficient treatment. (Dep. of Dr. Samuel Schroerlucke 38:14–22; Trial Ex. 18)

## DISCUSSION

The FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."[3] FTCA claims "entail a two-step analysis. First, the district court applies local law to determine liability and to assess damages. Second, federal law is invoked to bar proscribed recoveries, such as punitive damages."[4] Here, the United States concedes liability. Thus, the Court must only assess damages.

In Tennessee, damages in personal-injury actions "primarily compensate the wronged party for his or her injuries and are intended to make the wronged party whole."[5] Here, Keltner has the burden of proving damages, and his proof "must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages."[6] The existence of damages may not be based on conjecture or speculation, but mathematical certainty is not required in proving the *amount* of damages, which the plaintiff need only prove with reasonable certainty.[7] Here, Keltner has proven the existence of damages and given the Court a sufficient basis to make a reasonable estimate of such damages.

---

[3] 28 U.S.C. § 2647.

[4] *Kirchgessner v. United States*, 958 F.2d 158, 159 (6th Cir. 1992).

[5] *Mercer v. Vanderbilt*, 134 S.W.3d 121, 131 (Tenn. 2004).

[6] *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999).

[7] *Id.*

5

Keltner should recover damages in two broad categories. First, he should recover his economic damages. This includes medical expenses already incurred as a result of the collision and future expenses for reasonably necessary medical care. Second, he should recover his noneconomic damages. This includes the physical and emotional pain and suffering he experienced and continues to experience because of the collision, as well as his loss of enjoyment of life.

**I. Economic Damages**

Recovery for medical expenses in personal-injury cases is "limited to those expenses that are reasonable and necessary."[8] Keltner shall recover for his past and future medical expenses, but he has not proven a loss of future earnings.

### A. Past Medical Expenses

The parties do not dispute that Keltner received the following bills for medical treatment:

| | |
|---|---|
| Memphis Ambulance: | $747.00 (Trial Ex. 5) |
| Methodist Hospital Germantown: | $3,616.30 (Trial Ex. 7) |
| Dr. Frances Fenauty, ER physician: | $250.00 (Trial Ex. 9) |
| Memphis Radiological, P.C., ER services: | $370.00 (Trial Ex. 8) |
| Dr. Lyle Cooper, chiropractor: | $567.00 (Trial Ex. 10) |
| Tabor Orthopedics: | $10,255.00 (Trial Ex. 13) |
| Mid-South Interventional Pain Institute: | $31,894.02 (Trial Exs. 15, 16) |
| TOTAL: | $47,699.32 |

This total reflects the charge for services rendered rather than the actual amount paid by Keltner or Keltner's insurance on his behalf. The United States does not argue that Keltner may not recover medical expenses paid by his insurer. Instead, it argues that a reasonable assessment of medical damages should be determined by the discounted rate that his insurer previously

---

[8] *West v. Shelby Cnty. Healthcare Corp.*, No. W2012-00044-SC-R11-CV, 2014 Tenn. LEXIS 1033, at *20 (Tenn. Dec. 19, 2014) (internal quotation marks omitted).

negotiated and actually paid—$11,782.06—rather than the undiscounted rate that a healthcare provider might charge an uninsured or an insured with a different health insurer.

The Tennessee Supreme Court recently addressed a similar disagreement over healthcare bills in the context of hospital liens under the state's Hospital Lien Act.[9] In *West v. Shelby County Healthcare*, "the parties disagreed about the reasonableness of the amount of the [healthcare provider's] charges" for services.[10] The court found the disagreement "understandable because the [healthcare provider] had two versions of its costs—one for [the patients] and their insurance companies and another for the lien and the third-party tortfeasor."[11] The Court held that the healthcare provider's "non-discounted charges . . . should not be considered reasonable charges" for the purposes of the Hospital Lien Act. The non-discounted charges were not reasonable because they did not reflect the rate for services in the actual marketplace: few insurers pay the hospital's listed, full charge. Furthermore, healthcare providers further their own economic interest by agreeing to discount charges for patients insured by separate companies. Although ruling on the Hospital Lien Act, the Tennessee Supreme Court's reasoning should also aide this Court's duty to make a fair and reasonable assessment of damages.

Tennessee courts have not addressed the issue in a generic personal-injury case, but this Court finds the reasoning of the Supreme Court of California persuasive. In *Howell v. Hamilton Meats*, that court held that although "[t]he collateral-source rule precludes certain deductions against otherwise recoverable damages," it "does not expand the scope of economic damages to

---

[9] *See* Tenn. Code Ann. §§ 29-22-101 to 107.

[10] *West*, 2014 Tenn. LEXIS 1033, at *21.

[11] *Id.*

7

include expenses the plaintiff never incurred."[12] Thus, in California, "an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial."[13] Here, when Keltner's insurance provider paid a certain amount of money for medical care, the hospitals, clinics, and chiropractors' offices accepted that payment as payment in full. In other words, the non-discounted rate was not an "expense" because it was not "expended" or even "incurred": [14] the medical-care provider never demanded that Keltner or his insurer pay the chargemaster rate because that rate was inapplicable to Keltner. Thus, if the Court allowed Keltner to put forth evidence of a never-incurred price and refused to allow evidence that no one ever paid that price—the care provider all the while considering the bill paid in full—the result would be a windfall for the Plaintiff. Keltner would "recover" for medical expenses that were never incurred by anyone.

Thus, the negotiated rate is a fair assessment of Keltner's true damages. For those medical expenses, the Court awards Keltner $11,782.06 for past medical expenses. The Court must add to this total the expenses billed by the City of Memphis EMS ($747.00), ER Physician Francis J. Fenaughty ($250.00), and Chiropractor Lyle Cooper ($567.00)—amounts not included

---

[12] *Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1133 (Cal. 2011). The collateral-source rule "permits plaintiffs to prove and recover medical expenses, whether paid by insurance or not." *Steele v. Ft. Sanders Anesthesia Grp., P.C.*, 897 S.W.2d 270, 282 (Tenn. Ct. App. 1994) (citing *Donnell v. Donnell*, 415 S.W.2d 127, 134 (Tenn. 1967)). The doctrine is a "substantive rule of law that bars a tortfeasor from reducing damages owed to a plaintiff by the amount of recovery the plaintiff receives from sources that are collateral to the tortfeasor." *J&M, Inc. v. Cupples*, No. E2004-01328-COA-R3-CV, 2005 Tenn. App. LEXIS 301, at *7 (Tenn. Ct. App. May 20, 2005) (citing *Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994)).

[13] *Howell*, 257 P.3d at 1145.

[14] *See id.* at 1138 (citing Restatement (Second) of Torts § 924).

in the Defendant's calculation based on the discounted rate.[15] The Court awards compensatory damages in the amount of $13,346.06 for past medical expenses.

### B. Future Medical Expenses

As to future medical expenses and rehabilitation services, Keltner testified that so long as he feels as he does now, he will not attend physical therapy. In Tennessee, "persons seeking future medical expenses must present evidence (1) that additional medical treatment is reasonably certain to be required in the future and (2) that will enable the trier of fact to reasonably estimate the cost of the expected treatment."[16] Dr. Schroerlucke testified that the prescribed treatment for Keltner's limited pain is home exercises and nerve blocks.[17] Although he testified that he expected Keltner to have recovered by now—almost four years after the accident—Dr. Schroerlucke's testimony establishes that the nerve blocks are reasonably certain to be required in the future. Therefore, to make Keltner whole, he should recover the cost of future nerve blocks.

Tennessee's pattern jury instructions provide for damages equal to the present cash value of future medical services likely required in the future.[18] The Court "must have some factual basis for reasonably estimating the cost of the future medical expenses,"[19] but "if there is evidence in the record, which, together with reasonable inferences to be drawn from that

---

[15] *See* Def.'s Prop. Findings and Concls. ¶ 27, ECF No. 23.

[16] *Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 287 (Tenn. 2012) (quoting *Henley v. Amacher,* No. M1999-02799-COA-R3-CV, Tenn. App. LEXIS 72, at *45 (Tenn. Ct. App. Jan. 28, 2002)).

[17] Trial Tr. 28:17–29:14.

[18] 8 Tennessee Practice: Tennessee Pattern Jury Instructions—Civil 14.01.

[19] *Henley v. Amacher*, Tenn. App. LEXIS 72, at *48.

evidence, provides [the trier of fact] with a basis to make a fair and reasonable estimate as to the amount of damage, that is sufficient."[20]

In calculating the award for nerve blocks, the Court considers Keltner's age, the frequency with which nerve blocks will be required, and the cost of previous nerve blocks. Keltner is 66 years old. According to Tennessee's Mortality Tables, he has a life expectancy of 12.46 years.[21] He did not testify how many nerve blocks he will require, but at trial, he had not had a nerve block in almost a year and had no plans to request another until the current block became ineffective. Therefore, 8 nerve blocks over 12.46 years is a reasonable estimate.[22] No testimony at trial pointed to the exact cost of a nerve block from Mid-South Interventional Pain Institute, but Exhibit 15 shows that the Pain Institute charges Keltner $4,215.19 per nerve block.[23] Thus, the Court awards the cost of 8 nerve blocks—$33,721.52—as a fair and reasonable estimate of compensation for likely future medical expenses.[24]

---

[20] *Palmer v. Norfolk-S. Ry. Co.*, No. 03A01-9309-CV-00313, 1994 Tenn. App. LEXIS 162, at *9 (Tenn. Ct. App. Mar. 30, 1994).

[21] *See* United States Life Table, Tenn. Code Ann. Vol. 13.

[22] The Court reached this number by dividing the months of life expectancy, 149.52, by 18 months, leaving about 8 nerve blocks for the remainder of Keltner's life expectancy.

[23] See Trial Ex. 15. The Court added $2,954.14 for "destruction by neurolytic agent" and $1,261.05 for "cervical or thoracic, each additional facet joint" to reach $4,215.19. *See id.* The Defendant has not argued that this number should be reduced to the discounted rate as described above. Moreover, the uncertainty of Keltner's future health coverage makes it impossible to determine a separate price that Keltner may be required to pay in the future. Thus, the charged rate represents a reasonable calculation.

[24] Neither party presented calculations to the Court, nor did either party offer an economist to make calculations, reduce the number to present value, or adjust it for 8 withdrawals over 12.46 years. But Keltner has proven the existence of damages, and the Court's estimation is based on the facts before it.

### C. Future Earnings

As to loss of future earnings, the only evidence presented at trial was Keltner's statement that he turned down a job working with golf carts at a local golf course. He testified that he "had some friends that worked over at Fox Meadows Golf Course, and they said something to me after my wreck that there was a couple spots coming available."[25] He was not working at the time of the collision, and he offered no testimony other than hearsay of a potential one-day-per-week job opening. The Court cannot guess as to whether Keltner was offered a job by management, and therefore Keltner has failed to prove the existence of these damages to a reasonable degree of certainty.[26]

## II. Noneconomic Damages

As one Tennessee court noted, "[d]amages for pain and suffering and for the loss of enjoyment of life are not easily quantified and do not lend themselves to easy valuation."[27] Nevertheless, Keltner proved the existence of these damages at trial, and therefore the Court must place a value on the injuries.

### A. Pain and Suffering

Keltner gave extensive testimony about the pain that he suffered and continues to suffer in his neck and lower back. Keltner obviously suffered the worst pain upon impact and in the weeks following the collision. But his testimony establishes that the pain has subsided, at least to some degree. He did not seek treatment for over a year from November 2012 to February

---

[25] Trial Tr. 39:6–9.

[26] Keltner did not include loss of future earnings in his proposed findings of fact and conclusions of law, nor did he ever mention at trial any evidence related to earning capacity.

[27] *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 210–11 (Tenn Ct. App. 2008).

2014. Although he still experiences some pain and although Dr. Schroerlucke cannot estimate how long the pain will continue, Keltner did not testify that he feels debilitating pain in any way. Moreover, the nerve blocks—compensated as future medical expenses above—give Keltner relief from recurring pain in his neck, lower back, and leg. He did suffer substantially in the wake of the collision, and still suffers today, although less painfully. Thus, the Court awards Keltner $25,000 for his past and future pain and suffering.

**B. Loss of Enjoyment of Life**

Keltner has lost some capacity for the enjoyment of his life as a result of the collision. He described his current situation to the Court:

> Well, I mean my whole life has changed. My quality of life is gone. I don't know how they can put a price on what I have had to sacrifice for somebody running a red light, but I mean, I'm very limited on what I can do. I can't maintain my health.
> . . .
> I don't know if I'm going to mess my neck up or my back might go out. My left leg stays numb sometimes three or four hours in the morning before it loosens up. You know, I'm not into surgeries. Thank God for nerve blocks, you know. I just—I'll just take nerve blocks before I let somebody come in and cut on me that's not going to guarantee anything.[28]

Keltner testified mainly about his decrease in mobility while turning his neck around, his inability to play as much golf as he would like to, the change in his hunting hobbies, and trouble playing with his grandchildren due to his injuries. Generally, the Court finds that Keltner has not lost a substantial ability to enjoy his life. On cross-examination, the United States showed that Keltner still plays golf, still hunts certain game, and is not wholly unable to perform the activities that he used to enjoy. Nevertheless, the collision negatively affected his life in each of the

---

[28] Trial Tr. 41:6–21.

categories listed above, as set forth in the Court's findings of fact.  Thus, a fair and reasonable assessment leads the Court to grant Keltner $25,000 for his loss of enjoyment of life.

## **CONCLUSION**

The Defendant conceded liability.  At trial, Keltner proved that as a result of the Defendant's negligence, he suffered past and future medical expenses, pain and suffering, and loss of enjoyment of life.  The Court awards compensatory damages as outlined above, totaling $97,067.58.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
HON. S. THOMAS ANDERSON
UNITED STATES DISTRICT COURT

Date: June 12, 2015